[No. G034968. Fourth Dist., Div. Three. Mar. 15, 2007.]

CALIFORNIA HOUSING FINANCE AGENCY, Plaintiff and Appellant, v. HANOVER/CALIFORNIA MANAGEMENT AND ACCOUNTING CENTER, INC., et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II.B, C, D.2, D.3, E, F, and G.

## Counsel

O'Melveny & Meyers, Paul B. Salvaty, Richard W. Buckner, Kristina M. Hersey; and Thomas C. Hughes for Plaintiff and Appellant.

Bergman & Dacey, Gregory M. Bergman, Robert M. Mason III and Matthew R. Hicks for Defendants and Appellants.

## Opinion

**ARONSON, J.**—California Housing Finance Agency (CHFA) sued John G. Schienle, Robert L. McWhirk,[1] and Hanover/California Management and Accounting Center, Inc. (HC), for various torts including fraud, negligent misrepresentation and breach of fiduciary duty. CHFA also accused Schienle and McWhirk of having a financial interest in a government contract they made while in their official capacity as CHFA employees, a violation of Government Code section 1090 (all statutory references are to the Government Code, unless otherwise noted). A jury found for CHFA, awarding it compensatory and punitive damages against each defendant. The trial court awarded CHFA prejudgment interest and attorney fees.

Defendants contend the trial court should have granted their summary judgment motion because all of plaintiff's claims were time-barred. Defendants also complain the trial court improperly instructed the jury (a) on the discovery rule for statutes of limitations, (b) on liability under section 1090, and (c) that McWhirk owed CHFA fiduciary duties as a matter of law. Defendants further contend CHFA's attorney fee motion should have been denied because it was untimely, based on a void contract, and sought fees for noncompensable work. Finally, defendants argue CHFA's motion for prejudgment interest should have been denied because it was untimely and sought a double recovery.

We reject each of defendants' contentions. In the published portion of the opinion, we conclude any potential error in denying defendants' summary

---

[1] McWhirk was sued both as an individual and as Robert L. McWhirk, a professional corporation.

judgment motion was harmless because all factual disputes were fully and fairly litigated at trial. We also conclude the trial court did not err in instructing the jury liability may attach under section 1090 for a person designated an independent contractor. In the unpublished portion of the opinion, we conclude the trial court correctly instructed the jury on the limitations defense, and defendants' failure to offer clarifying instructions for any perceived instructional ambiguity forecloses further consideration of the issue. The trial court properly rejected defendants' contention that civil liability under section 1090 requires the jury to find defendants acted "knowingly." Defendants' argument that McWhirk, CHFA's attorney, did not owe CHFA fiduciary duties is patently meritless, and the trial court correctly instructed the jury that McWhirk was CHFA's fiduciary. CHFA timely filed its attorney fee motion, and sought only compensable fees based on its contract. Finally, we conclude CHFA timely requested prejudgment interest, and the award did not constitute a double recovery. Accordingly, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

CHFA is a component unit of the State of California, created under the Zenovich-Moscone-Chacon Housing and Home Finance Act, codified as Health and Safety Code section 50000 et seq. CHFA's mission is to provide affordable housing in the state. (See Health & Saf. Code, § 50003.) To accomplish this, CHFA acts as direct lender, loan purchaser, and mortgage insurer of both its own loans and those of other lenders. (See Health & Saf. Code, §§ 50000, 51611.) CHFA's mortgage insurance programs are conducted with funds held in the California Housing Loan Insurance Fund (Insurance Fund) under Health and Safety Code section 51611.

Schienle served as CHFA's director of insurance from 1986 through 2001, reporting directly to CHFA's highest officer, the executive director. McWhirk served as CHFA's general counsel from 1984 until 1990. From 1991 through 2000, McWhirk became CHFA's outside counsel under a series of written agreements.

During the first half of Schienle's tenure, the Insurance Fund collected mortgage insurance premiums exclusively on an annual basis. In 1994 or 1995, Schienle took steps to have the Insurance Fund offer mortgage insurance programs in which the lenders and loan servicers could pay premiums monthly. In late 1995 and early 1996, Schienle and McWhirk created HC to provide CHFA insurance premium processing services. McWhirk incorporated HC, acted as its legal counsel, and served as president and chief executive officer during the time he also served as CHFA's outside counsel.

McWhirk operated HC from his residence, and arranged for his domestic partner, Michael Misita—who had no mortgage insurance or accounting experience—to manage its day-to-day activities. To hide their interest in HC, Schienle and McWhirk brought in Roger Formisano to pose as HC's sole owner, promising Formisano $100,000 if he would participate in the scheme. Formisano never owned any interest in HC, but held the company's stock for McWhirk and Misita with directions to relinquish the stock to them when McWhirk no longer represented CHFA.

In early 1996, Schienle and McWhirk influenced CHFA to enter into a contract with HC (HC contract), whereby HC would collect monthly premiums from lenders and loan servicers and forward the premiums to CHFA, after deducting HC's "operating costs." Schienle drafted the HC contract, which was the only agreement he drafted during his CHFA tenure. The agreement failed to describe HC's services, continued in perpetuity with no termination date, included no audit provisions, and failed to define the amount of HC's compensation. Neither Schienle nor McWhirk ever disclosed their interest in HC to anyone at CHFA.

Under the HC contract, the amount deducted from the premiums for operating costs increased dramatically after four years into the policy period, and after year five, HC could keep all of the premiums it collected. In other words, after five years into any particular policy HC would cease remitting to CHFA any part of the premiums it collected, even though CHFA would continue to provide mortgage insurance. In 1996, the first year of operation, HC collected approximately $59,000 in premiums, kept $35,000, and forwarded $24,000 to CHFA. During the last two and one-half years of operation, from 2000 through the first six months of 2002, HC skimmed approximately $6 million from the premiums it received.

As the volume of HC's business grew, defendants hired Misita's nephew and McWhirk's sister to assist in processing the insurance premiums. In 1999, HC paid Formisano the $100,000 initially promised. At the end of 2000, McWhirk ceased acting as CHFA's outside counsel. In early 2001, Formisano surrendered his stock to HC without receiving further consideration, and HC reissued stock to McWhirk and Misita, making them the sole owners of the company. During the scheme, HC paid McWhirk substantial legal fees, leased space in his residence, and paid numerous personal expenses, including the lease on a new Mercedes automobile. HC funds were also used to fund two other companies, Stars and Stripes (California) and Stars and Stripes (Nevada), also owned by McWhirk and Misita. Schienle served as an officer and director in both Stars and Stripes companies, and received substantial financial benefits from them and through HC.

Schienle retired from CHFA in December 2001. Shortly thereafter, Schienle's replacement discovered the HC contract in a stack of papers Schienle had left behind. Concerned about the agreement, CHFA launched an investigation into the contract and HC. After hiring the accounting firm of PricewaterhouseCoopers, CHFA discovered Schienle and McWhirk's involvement in the matter, and terminated the HC contract. On June 14, 2002, CHFA filed suit against Schienle, McWhirk, and HC. CHFA's third amended complaint sought damages for fraud, negligent misrepresentation, breach of fiduciary duty, violation of section 1090, legal malpractice, negligence, and breach of contract. The complaint also sought a declaration that the HC contract was void, restitution and injunctive relief based on Business and Professions Code section 17200 et seq., and an accounting. HC filed a cross-complaint against CHFA for breach of the HC contract.

Defendants moved for summary judgment, arguing that CHFA's action was barred under the applicable statutes of limitations. The court denied the motion, finding a triable issue of fact on whether defendants fraudulently concealed the facts upon which the causes of action were based, and on whether CHFA should have known about defendants' wrongdoing more than three years before it filed the action. McWhirk also filed a separate summary adjudication motion asserting he owed no duty to CHFA because he acted as an independent contractor for the Insurance Fund. The court denied the motion, finding a triable issue of fact on whether McWhirk was CHFA's fiduciary.

Following a seven-week trial, the jury returned its verdict finding (a) each defendant liable for fraud and negligent misrepresentation; (b) Schienle and McWhirk liable for breach of fiduciary duty and violation of section 1090; and (c) McWhirk liable for legal malpractice and breach of contract. The jury awarded CHFA compensatory damages of $6,744,602 and $375,000 in punitive damages against each defendant, and awarded prejudgment interest from the date the action was filed. The jury found in CHFA's favor on HC's cross-complaint. Following the jury verdict, the trial court determined that defendants violated Business and Professions Code section 17200 et seq., and ordered restitution in the amount of $6,744,602. Following the verdict, the trial court awarded prejudgment interest of $1,149,903.72 on CHFA's tort claims against all defendants, and an additional $492,817.15 against McWhirk based on CHFA's contract claims.

## II

### DISCUSSION

A. *Defendants May Not Challenge the Denial of Their Summary Judgment Motion Because the Parties Litigated the Same Issues at Trial*

Defendants contend the trial court erred when it denied their summary judgment motion, which sought dismissal of CHFA's claims based on statutes of limitations. CHFA contends that orders denying summary judgment based on triable issues of fact are not reviewable as a matter of law after a full trial covering the same issues. We agree with CHFA.

In *Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830 [16 Cal.Rptr.2d 38] (*Waller*), the trial court denied the defendants' summary judgment motion. A jury later decided the same issues at trial in the plaintiff's favor. The Court of Appeal declined to review the summary judgment denial, reasoning that the defendants suffered no prejudice because they received a jury trial on the merits. (*Id.* at p. 836.) *Waller* explained: "When the trial court commits error in ruling on matters relating to pleadings, procedures, or other preliminary matters, reversal can generally be predicated thereon only if the appellant can show resulting prejudice, and the probability of a more favorable outcome, *at trial.* [California Constitution] Article VI, section 13, admonishes us that error may lead to reversal only if we are persuaded 'upon an examination of the entire cause' that there has been a miscarriage of justice. In other words, we are not to look to the particular ruling complained of in isolation, but rather must consider the full record in deciding whether a judgment should be set aside. Since we are enjoined to presume that the trial itself was fair and that the verdict in plaintiffs' favor was supported by the evidence, we cannot find that an erroneous pretrial ruling based on declarations and exhibits renders the ultimate result unjust." (*Id.* at p. 833.)

Defendants rely on the recent case of *Gackstetter v. Frawley* (2006) 135 Cal.App.4th 1257 [38 Cal.Rptr.3d 333] (*Gackstetter*), which distinguished *Waller.* In *Gackstetter*, the defendants unsuccessfully raised a defense of good faith settlement under Code of Civil Procedure section 877.6 in their summary judgment motion. On appeal, the defendants argued the trial court erred in denying their summary judgment motion. *Gackstetter* accepted *Waller*'s conclusion that a reviewing court will not consider whether a trial court erred in denying a summary judgment motion based on triable issues of fact following a full trial of those same issues. (*Gackstetter*, at p. 1268.) The court explained: " 'A decision based on less evidence (i.e., the evidence presented on the summary judgment motion) should not prevail over a decision based on more evidence (i.e., the evidence presented at trial).' " (*Id.* at p. 1269,

quoting Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (2004) ¶ 8:168.10, p. 8-114.) *Gackstetter* nonetheless reviewed the trial court's denial of summary judgment because the good faith issue was not based on disputed facts which were resolved at a subsequent trial. The court recognized the good faith settlement issue could have been raised in a number of different ways, and the defendants had not forfeited review merely because they chose summary judgment as the procedural device to assert their good faith settlement defense. (*Gackstetter*, at p. 1269.)

Defendants also cite *Sturm, Ruger & Co. v. Superior Court* (1985) 164 Cal.App.3d 579 [210 Cal.Rptr. 573] and *Coy v. County of Los Angeles* (1991) 235 Cal.App.3d 1077 [1 Cal.Rptr.2d 215] (*Coy*) to support the notion that a reviewing court could consider whether the trial court erred in denying summary judgment despite a full trial on the same issues. *Sturm* does not support defendants' argument. There, the trial court simply recognized that a party's failure to timely seek writ review of an order denying summary judgment did not prevent that party from raising the same issues at trial, or from appealing the resulting judgment. (*Sturm*, at p. 582.) Nothing in *Sturm* suggested the moving party could obtain reversal based on the trial court's erroneous summary judgment denial where the same issue was adversely decided against the moving party following a fair trial.

■ *Coy, supra*, 235 Cal.App.3d 1077, reversed a judgment following a jury trial based on the trial court's erroneous summary judgment denial. But there, the court expressly noted the plaintiff had not contested the defendant's ability to challenge the pretrial summary judgment ruling on appeal after trial. (*Id.* at p. 1082, fn. 2.) Because the issue was never addressed, *Coy* offers no support for defendants' argument. (See *People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10 [17 Cal.Rptr.3d 302, 95 P.3d 523] ["It is axiomatic that cases are not authority for propositions not considered"].)

Here, the trial court denied defendants' summary judgment motion because it found triable issues of fact on whether defendants fraudulently concealed facts upon which the causes of action were based, and whether CHFA should have known about defendants' wrongdoing more than three years before it filed the action. These factual issues were fully litigated at trial and determined adversely to defendants. For that reason, no miscarriage of justice occurred when the trial court denied defendants' summary judgment motion.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 682.

D. *The Trial Court Properly Instructed the Jury on Section 1090*

1. *The Trial Court Did Not Err in Instructing the Jury That Section 1090 May Apply to Independent Contractors*

Section 1090 provides, in relevant part: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity." The trial court instructed the jury that "[t]he 'officer or employee' language of Section 1090 must be interpreted broadly. The fact that someone is designated an independent contractor is not determinative; the statute applies to independent contractors who perform a public function." Defendants contend the trial court erred in giving this instruction because section 1090 applies only to a public agency's "officers or employees," and therefore could not apply to McWhirk, an independent contractor. We disagree.

The common law distinction between an employee and an independent contractor developed as the courts attempted to establish the parameters for imposing tort liability on the master for the acts of the servant. The Supreme Court in *Boswell v. Laird* (1857) 8 Cal. 469, 489 explained: "The responsibility is placed where the power exists. Having power to control, the superior or master is bound to exercise it to the prevention of injuries to third parties, or he will be held liable."

The common law, however, does not always govern a reference to employment in a particular statute. (*S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 351 [256 Cal.Rptr. 543, 769 P.2d 399].) Rather, employment "must be construed with particular reference to the 'history and fundamental purposes' of the statute." (*Ibid.*) In contrast to the common law, section 1090 is not concerned with holding a public entity liable for harm to third parties based on its agent's acts. Rather, it places responsibility for acts of self-dealing *on the public servant* where he or she exercises sufficient control *over the public entity*, i.e., where the agent is in a position to contract in his or her "official capacity." Thus, the common law employee/independent contractor analysis is not helpful in construing the term "employee" in section 1090.

Section 1090, like all conflict of interest statutes, "cannot be given a narrow and technical interpretation that would limit [its] scope and defeat the

legislative purpose." (*People v. Honig* (1996) 48 Cal.App.4th 289, 314 [55 Cal.Rptr.2d 555] (*Honig*).) Thus, in *Honig*, the court construed the "financially interested" element in section 1090 to include not only financial benefits the official personally received, but also those accruing to a nonprofit organization employing the official's spouse. Similarly, in *Stigall v. City of Taft* (1962) 58 Cal.2d 565, 569 [25 Cal.Rptr. 441, 375 P.2d 289], the California Supreme Court interpreted section 1090's imposition of liability for "any contract made" by financially interested officials to cover preliminary matters, such as "negotiations, discussions, reasoning, [and] planning." (*Ibid.*; see also *Thomson v. Call* (1985) 38 Cal.3d 633, 644–645 [214 Cal.Rptr. 139, 699 P.2d 316] [successive, related agreements considered a single "contract" under § 1090].) The court explained that applying the general rule that a contract is not "made" until the parties mutually agree would frustrate section 1090's purposes. Accordingly, in construing section 1090 in any particular situation, " '[w]e must disregard the technical relationship of the parties and look behind the veil which enshrouds their activities in order to discern the vital facts. [Citation.]' " (*Honig*, at p. 315.)

Courts have recognized that liability under section 1090 may apply to an outside attorney in a position of influence over the public agency. For example, in *People v. Gnass* (2002) 101 Cal.App.4th 1271 [125 Cal.Rptr.2d 225] (*Gnass*), the defendant was a partner in a private law firm acting as city attorney under a contract, which paid the firm a monthly retainer based on a set number of hours per month, and an hourly rate thereafter. (*Id.* at p. 1279.) The city and its redevelopment agency formed a public financing authority, for which the defendant also acted as counsel. The public financing authority then joined with other local public agencies to form a number of joint power authorities which issued a series of bonds. The defendant earned fees from the bond issues either for services rendered as disclosure counsel or for services rendered to another attorney who acted as disclosure counsel. The Court of Appeal determined the grand jury had probable cause to believe the defendant violated section 1090 based on the fees earned in connection with the bond issues. (101 Cal.App.4th at pp. 1278–1279.) The court recognized that neither the city nor the defendant was a party to the contracts for the bond issues, but nonetheless concluded the defendant had acted in an official capacity because he "was in a position to exert considerable influence over the decisions" of the public financing authority to enter into joint powers agreements and issue the bonds. (*Id.* at p. 1298.)[2]

Similarly, in *Campagna v. City of Sanger* (1996) 42 Cal.App.4th 533 [49 Cal.Rptr.2d 676], the defendant was an associate, and later a partner, of a law firm acting as city attorney. Under a written agreement, the city paid the firm

---

[2] The *Gnass* court, however, upheld the trial court's dismissal of the indictment due to the prosecutor's failure to properly instruct the jury.

a flat monthly amount for general consulting, and agreed to pay for other services, such as litigation, " 'on a reasonable legal fee basis, depending upon the type of service rendered.' " (*Id.* at p. 535.) The city asked the defendant to retain an outside law firm to file a claim against several chemical companies. The defendant negotiated, and the city approved, a written contingency fee agreement with his own firm in association with another firm. The agreement disclosed the total contingency fee, but failed to reveal the associated firm had agreed to pay the defendant a referral fee of 35 percent of the total fee. The court recognized the defendant acted as a private attorney in negotiating the contingency fee between his firm and the city, but concluded he acted in an official capacity in choosing the associated firm and negotiating with it, rendering him liable under section 1090. (42 Cal.App.4th at pp. 541–542.)

In *Schaefer v. Berinstein* (1956) 140 Cal.App.2d 278 [295 P.2d. 113] (*Schaefer*), the city had contracted with an attorney to rehabilitate tax-deeded and "special assessment frozen" properties within the city. (*Id.* at p. 291.) The attorney had purchased many of these properties from the city through third parties at prices far below their fair market value, while assuring the city the price paid was fair. The court ruled the attorney violated a city charter provision similar to the current version of section 1090, which prohibited an " 'officer or employee' " of the city from having a financial interest in a transaction with the city. (*Schaefer*, at p. 287, fn. 2.)

The court in *Schaefer* observed that even without the city's conflict of interest charter provision, the attorney's actions would have violated section 1090, even though the statute at that time did not expressly include "employees." (*Schaefer, supra*, 140 Cal.App.2d at p. 291.) The court observed: "Statutes prohibiting personal interests of public officers in public contracts are strictly enforced. [Citation.] . . . [¶] . . . A person merely in an advisory position to a city is affected by the conflicts of interest rule. [Citation.] . . . [The retained attorney] was an officer and agent of the city and as such was in a position to advise the city council as to what action should be taken relative to the property involved." (*Ibid.*; see also *Terry v. Bender* (1956) 143 Cal.App.2d 198 [300 P.2d 119] (*Terry*) [involving the same attorney and scheme].)

The California Attorney General has opined that a financial consultant retained on a temporary basis to provide advice in connection with a bond issue is an "employee" under section 1090 despite being an independent contractor. (46 Ops.Cal.Atty.Gen. 74 (1965).)[3] Relying in part on *Schaefer*

---

[3] "Although we are not bound by the Attorney General's opinions, they are entitled to 'considerable weight.' " (*Gnass, supra*, 101 Cal.App.4th at p. 1304.)

and *Terry*, the Attorney General observed: "It seems clear that the Legislature in later amending section 1090 to include 'employees' intended to apply the policy of the conflicts of interest law, as set out in the *Schaefer* and *Terry* cases, to independent contractors who perform a public function and to require of those who serve the public temporarily the same fealty expected from permanent officers and employees." (*Id.* at p. 79.)

■ Consistent with the above authorities, we conclude that an attorney whose official capacity carries the potential to exert "considerable" influence over the contracting decisions of a public agency is an "employee" under section 1090, regardless of whether he or she would be considered an independent contractor under common law tort principles. (See *Gnass, supra,* 101 Cal.App.4th at p. 1298.) Otherwise, the attorney could manipulate the employment relationship to retain "official capacity" influence, yet avoid liability under section 1090. Indeed, the evidence presented here suggests such a situation. McWhirk was CHFA's in-house counsel for six years, becoming its outside counsel before commencing the insurance skimming scheme with Schienle. Nothing in the record demonstrates McWhirk's change in title diminished his influence over the agency.

The authority defendants rely on does not contradict our conclusion. Specifically, defendants misconstrue a footnote in *Gnass* to support the argument section 1090 does not apply to independent contractors. (See *Gnass, supra,* 101 Cal.App.4th at p. 1302, fn. 10.) But the opinion merely described the trial court's response to the prosecutor's argument that the lawyer's independent contractor status deprived him of the defense in section 1091.5, subdivision (a)(9), which exempts "[a]n officer or employee" from liability from certain transactions where a full disclosure has been made.[4] Recognizing the apparent incongruity of asserting section 1090 applied to the defendant, but the similarly worded section 1091.5 did not, the appellate court remarked: "Of course, if Gnass was not an 'employee' for purposes of section 1091.5, neither was he for purposes of section 1090, in which case the conflict-of-interest statutes would not apply at all. We see no reason why one could be an employee for one and not the other." (*Gnass,* at p. 1302, fn. 10.) The *Gnass* court already had determined the attorney fell within the scope of

---

[4] This section provides: "(a) An officer or employee shall not be deemed to be interested in a contract if his or her interest is any of the following: [¶] . . . [¶] (9) That of a person receiving salary, per diem, or reimbursement for expenses from a government entity, unless the contract directly involves the department of the government entity that employs the officer or employee, provided that the interest is disclosed to the body or board at the time of consideration of the contract, and provided further that the interest is noted in its official record." (§ 1091.5 subd. (a)(9).)

section 1090. Thus, the court simply questioned the prosecutor's argument that section 1091.5 did not cover the defendant's conduct, but did not suggest independent contractors are exempt from liability under section 1090.

Also unavailing is defendants' reliance on *Pacific Finance Corp. v. Lynwood* (1931) 114 Cal.App. 509 [300 P. 50] (*Pacific Finance*). There, the city attempted to prevent payment to the assignee of an engineer retained by the city, arguing that public policy prohibited assignment of a public officer's unearned salary. The court rejected the city's argument that the engineer was a public officer, observing: "There is not a word in the contract between [the engineer] and appellant city which indicates that the parties were endeavoring to insert [the engineer] into the office of city engineer . . . or to create for him any public office. He is not, by virtue of the contract, a public officer." (*Id.* at pp. 514–515.)

*Pacific Finance* does not aid defendants for two reasons. First, the case never addressed when a contracting party could be considered an employee of a public agency. Thus, even if McWhirk was not an "officer" under the holding of *Pacific Finance*, he still could be an "employee" under section 1090. Second, defendants have not demonstrated any parallel between section 1090 and the policy against assignment of a public officer's unearned salary. As we have discussed, conflict of interest provisions "cannot be given a narrow and technical interpretation that would limit their scope and defeat the legislative purpose." (*Honig, supra*, 48 Cal.App.4th at p. 314.) Absent some showing that the public policy at issue in *Pacific Finance* has a scope and purpose similar to the conflict of interest statutes, we decline to engraft the court's "public officer" analysis onto section 1090. In sum, we reject defendants' challenge to the trial court's jury instruction that section 1090 may never apply to independent contractors.

2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

E.–G.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 682.

## III

### Disposition

The judgment and orders are affirmed. CHFA is entitled to its costs of this appeal.

Rylaarsdam, Acting P. J., and Fybel, J., concurred.